ESTHER KOLODNEY, ADMINISTRATRIX (ESTATE OF SAMUEL KOLODNEY) *v.* ABRAHAM KOLODNEY ET AL.

SUPERIOR COURT      HARTFORD COUNTY      FILE No. 110480

Memorandum filed April 24, 1959

*Ralph C. Dixon,* of Hartford, with whom was *Abraham Silver,* of New Britain, for the plaintiff.

*Joseph Adinolfi, Jr.,* of Hartford, for the defendants.

PHILLIPS, J. This was a companion suit with *Esther Kolodney* v. *Kolodney Bros., Inc.,* Superior Court, Hartford County, No. 110478, and *Esther Kolodney, Administratrix* v. *Kolodney Bros., Inc.,* Superior Court, Hartford County, No. 113511, and the three suits were tried together. It was agreed by counsel that the evidence in each of these suits should be considered by the court in the other suits so far as relevant and admissible, and particularly that evidence affecting the credibility of witnesses in any one suit could be considered in weighing the credibility of these same witnesses in the other suits. The three memorandums of decision should be read together.

### FIRST COUNT

The defendants Abraham and Ralph Kolodney present no defense to this count. They therefore concede that on October 8, 1953, while Samuel was on his deathbed, they withdrew from the joint account of the three brothers in the New Britain Trust Company the sum of $2000, the total amount in this account being $2014.95, and that they thereby ap-

propriated Samuel's share in this account and wrongfully withheld it from the plaintiff as administratrix of Samuel's estate. The check was signed by both Ralph and Abraham. It was dated October 6, but it is the court's belief that the check was predated to make it appear that it was drawn before Samuel was taken sick. In any event, the money was drawn out October 8, 1953.

This concession was made after Abraham, on the second day of the trial, first denied that Samuel had an interest in this account and then denied that he, Abraham, had power to sign checks on this account. The action of Ralph and Abraham in appropriating this money, as well as the evasive and untrue testimony of Abraham with respect to it, cannot but have a profound effect upon the court with respect to their good faith and credibility.

Judgment should enter on this count against defendants Ralph and Abraham Kolodney in the stipulated amount of $671.65, with interest of $214.93 from October 9, 1953, to February 9, 1959, or a total of $886.58, plus interest at the rate of 11 cents a day from February 9, 1959, to the date of judgment, $8.14, a total of $894.72.

### SECOND COUNT

In this count, the plaintiff claims a one-third interest in the checking account in the New Britain National Bank standing in the name of Samuel, Abraham and Ralph Kolodney. On October 9, 1953, the balance in the account was $1542.19. This account was the rent account for the Stanley Street properties, lots 1, 3, 4, 5, 6 and 7. With the exception of lot 6, which had been transferred to the three brothers, these lots all belonged to Dora Kolodney and the proceeds from them were hers (see memorandum on sixth count). It was not proved how

much of this account could be traced to lot 6, and therefore the plaintiff has failed to meet her burden of proof on this count. *Rumberg* v. *Cutler,* 86 Conn. 8, 14.

THIRD COUNT

Under the third count, the plaintiff claims that on October 8, 1953, the day before Samuel died, Abraham and Ralph removed $70,000 in currency from the joint box of the three brothers in the New Britain National Bank, leased a new box in the name of Abraham and Ralph and put the $70,000 therein. She claims one-third of this money for the estate. This is a most serious charge and has criminal aspects if it can be proved.

The plaintiff relies upon alleged conversations with the deceased upon several occasions in which he stated to her that the brothers had large amounts of currency in the box. She testified that on the morning of October 8, the day before he died, he told her to run down to the store and give a message to Abe to remove $70,000 in currency from the box, that she did this, and at 8:55 (she was very specific about the exact time) she met Ralph outside the store and gave him the message. It was established definitely that Ralph and Abraham did open the box at 9:01 on that morning, and that at 9:10 they leased another box in their joint names, Ralph and A. Joseph Kolodney. Their story is that they removed from the box their insurance policies, stocks in the name of the three brothers, a bond, and confirmation slips, and that they put those items in the new box in their two names, knowing that if Samuel died the box of the three brothers would be sealed up. They deny categorically that there was any currency in the box. Ralph denies that Esther gave any such message. Ralph and Abraham claim they first saw her in the store about 10 a.m. They also deny categorically

that Esther Kolodney made any demands for this cash from then until the spring of 1957.

The issue presents a difficult problem in credibility. The court can only weigh the testimony in the light of all the evidence in the case reflecting upon the veracity and honesty of the parties, and thus come to its conclusion, bearing in mind that the plaintiff must satisfy the court upon this issue by a fair preponderance of the evidence. Immediately the fact stands out that the plaintiff never made any such claim in the probating of the estate of Samuel. Thus, she signed and swore to the inventory on January 26, 1954, which contained no suggestion of a claim for an interest in $70,000 in cash; the same as to the final account October 8, 1954. The succession tax return was signed and sworn to by her July 26, 1954, with no report of any cash; and the decree of succession tax ($704.35) was not based upon a figure including a third of $70,000. The estate was distributed December 10, 1954, to Esther and her son, Joseph Kolodney. During all this period, in fact until the estate was opened by petition dated March 14, 1957, Esther Kolodney failed to make any official claim, either to the lawyer who was handling her estate or to the judge of probate, or to anyone else, that the estate was entitled to this money. From this failure to make a claim for this large sum of money, to inventory it or to pay a tax on it, a strong inference arises that she had no such claim.

Other things cast doubt upon her testimony: although subjected to the most searching cross-examination as to what she did on the morning of October 8, 1953, she never wavered in her statement that she turned on her heel after delivering the message to Ralph at 8:55 a.m. and hurried back to the hospital. Yet it subsequently was shown that at

9:10 that very morning she opened the safe deposit box at the New Britain Trust Company which was in her name and Samuel's. It is true that she later revised her testimony and admitted that she did this. Her original testimony was given Wednesday, January 21. On that day the plaintiff produced Mr. Bertini, the assistant treasurer of the New Britain National Bank, who gave testimony concerning Ralph and Abraham opening the joint box of the brothers at 9:01 a.m. October 8, 1953. On Thursday night Mrs. Kolodney called her lawyer and told him of her change of recollection concerning her activities on the morning of October 8. On the following Tuesday her lawyer attempted to have her testify to her changed recollection but the court suggested this be postponed. On Thursday, January 29, the defendants submitted evidence of her opening the New Britain Trust Company box at 9:10 a.m. October 8. Subsequently, she testified in accordance with her new recollection. It may have occurred to Mrs. Kolodney, after the testimony of Mr. Bertini, that her own activities with respect to her own box in the other bank might be similarly revealed. Her story concerning the sealed envelope she obtained from her box and brought back to her husband, who opened it and tore up the contents, did not ring true. In fact, it was so unlikely in all its details as to be scarcely credible. What the real purpose of her trip to the safe deposit box in the New Britain Trust Company on the morning of October 8 was, the court can only conjecture, and the conjecture is not relevant to the instant case. Whatever that purpose may have been, her failure to tell the whole story on her direct examination and under the most searching cross-examination which followed casts grave doubts upon her credibility.

It is not impossible that Samuel Kolodney told his wife from time to time that they, the brothers,

now had such and such an amount in the safe deposit box, meaning that amount in value of securities, and that Mrs. Kolodney misinterpreted his remarks or built them up in her mind as meaning cash. This is the most favorable view that the court can take as bearing upon her credibility. That the Kolodneys would have large sums of money in cash in a safe deposit box, not bearing interest, does not seem in keeping with their habits of business. There is no evidence suggesting that they were in the habit of so doing or of transactions or sources from which large sums of money had been derived. It appears, on the contrary, that they had a predilection for investing in stocks. And on the one occasion when Ralph and Abraham acquired $10,000 apiece in cash from Samuel's life insurance, they immediately deposited the money in savings banks.

The court does not purport to say with finality that Abraham and Ralph Kolodney did not remove cash from the joint safe deposit box on the morning of October 8, 1953. The court is not clairvoyant. Their conduct in appropriating the $2000 in the joint account of the three brothers on that same morning (see count one), as well as sundry underhanded dealings on other occasions which came to light during the trial, such as the completely phony mortgage which Abraham gave his brother on his residence to circumvent possible attachments by creditors, suggests that they were not incapable of doing what is charged by the plaintiff in this count. The court can only decide the issue in accordance with the law of burden of proof. It cannot base a judgment upon so serious a matter upon conjecture or speculation. Considering all the facts and weighing the credibility of the witnesses as best it can, the court cannot find that the plaintiff has proved this count by a fair preponderance of the evidence.

### FOURTH COUNT

The defendants now concede, though they denied it by their pleadings, that Ralph and Abraham wrongfully withheld from Samuel's estate the sum of $380, being a one-third interest in a loan to Archie Waters who is presently employed by Kolodney Brothers Hardware Company. Interest has been waived by the plaintiff. Judgment may enter on this count for $380 against defendants Ralph and Abraham Kolodney.

### FIFTH COUNT

The plaintiff has withdrawn her claim to a one-third interest in the two stocks, and the only issue involved is a one-third interest in the Manati Sugar Corporation bond having a par value of $1000. This bond was removed from the safe deposit box of the three brothers by Ralph and Abraham on October 8, 1953, along with other securities. They paid interest upon this bond to Esther Kolodney for one or two years after Samuel's death. Although the bond was purchased June 27, 1938, in the name of Abraham, it was a bearer bond and kept in the safe deposit box where the common property of the three brothers was kept. The estate of Samuel is entitled to a one-third interest in this bond. In accordance with stipulation as to amount, judgment may enter on this count against the defendants Ralph and Abraham Kolodney in the amount of $333.33 without interest.

### SIXTH COUNT

This count concerns real estate, title to which, at the time of Samuel Kolodney's death, was in the name of his mother, Dora Kolodney. The properties involved are located on Stanley Street, New Britain. Lot 1 (1515 Stanley Street), a vacant lot, was conveyed Andrews to Abraham Kolodney June 24, 1925,

and quitclaimed by him to Dora April 12, 1926. Lots 3 and 4 (1523-1529 Stanley Street) were conveyed by one Ward to Dora on February 12, 1922. There is a gasoline station and a drugstore on this lot. Lot 5 (1531-1535 Stanley Street) was conveyed Peters to Samuel Kolodney, October 31, 1921, he giving back a purchase money mortgage of $775. On April 30, 1923, Samuel mortgaged this property to Commercial Trust Company for $8000 contemporaneously with the construction of two stores upon it. On August 27, 1924, Samuel quitclaimed this property to Dora. Lot 7 (1541-1543 Stanley Street) was conveyed, Donahoe to Ralph Kolodney on May 18, 1923, subject to a mortgage of $6000, and he gave back to Donahoe a purchase money mortgage for $3000. Ralph quitclaimed this property to Dora April 12, 1926. There is a store and 7-room apartment on it. On April 16, 1926, Dora mortgaged all these properties, plus lot 6, to the Commercial Trust Company for $50,000, payable $5000 one year from date, $5000 two years from date, and the balance three years from date. This mortgage was released August 13, 1934, the mortgagee then being in receivership. The proceeds from this mortgage were turned over by Dora to her sons, Samuel and Ralph, to go into business. On November 2, 1953, about a month after Samuel's death, Dora quitclaimed lots 1, 3, 4, 5 and 7 to Ralph and Abraham. Thus from April 12, 1926, legal title to all the lots in dispute remained in Dora Kolodney until November 2, 1953. Every deed conveying title to her was absolute on its face and purported to be for a valuable consideration.

The issues with respect to these lots are to be determined by the allegations of the sixth count of the amended complaint filed January 13, 1959. It is alleged that Samuel purchased all these lots originally with his own funds, causing lots 3 and 4 to

be placed in the name of his mother Dora, lot 7 in the name of his brother Ralph, lot 1 in the name of his brother Abraham. As to lot 5, it is alleged that he conveyed it to his mother without consideration. At the time of these transactions and the subsequent transfers of lots 1 and 7 to Dora, it is alleged that beneficial ownership of the real estate, including buildings, remained in Samuel and there existed a confidential relation and a trust whereby Samuel retained the beneficial interest; further, that it was expressly agreed that the transferees would reconvey any or all of this real estate to Samuel whenever he so requested. It is further alleged that during his lifetime Samuel exercised the rights of ownership in these parcels of real estate by managing, operating and improving them, appropriating their income to his own use and sharing the income with his two brothers. In the final paragraph it is alleged that defendants have refused to transfer this real estate to the plaintiff as administratrix and have refused to recognize the trust impressed upon it and the agreement to reconvey it. The prayers for relief include a claim for an order directing that Ralph, Abraham and Dora assign title to this real estate or an accounting of its proceeds.

The plaintiff's claim thus appears to rest upon a trust in favor of Samuel Kolodney. Since there is no writing, such trust would have to be a resulting trust or a constructive trust. Much of the plaintiff's brief on this particular issue is concerned with the claim that there was a joint adventure with respect to this real estate between the three brothers. The pleadings, however, do not encompass such a relationship. There is no mention in them of joint adventure. There are no facts alleged upon which a joint adventure could be based. The whole theory of the complaint appears to be that Samuel Kolodney, and Samuel Kolodney alone, had the "beneficial

ownership" of this real estate, and that his administratrix is entitled to an order directing Ralph, Abraham and Dora to assign legal title to it to the plaintiff administratrix. To constitute a joint adventure two or more parties must combine their property, money, efforts, skill or knowledge in some common undertaking. *Dolan* v. *Dolan,* 107 Conn. 342, 349; *Lesser* v. *Smith,* 115 Conn. 86, 89. Nothing of the sort is alleged in the pleadings. It should be noted that even had joint adventure been alleged it would have been difficult to spell it out from the facts. Whether there is a joint adventure is a question of fact. *Brower* v. *Perkins,* 135 Conn. 675, 683. Without going into details, the court could not find that the plaintiff has satisfied the burden of proving a joint adventure. From the evidence, including an examination of the books pertaining to the Dora and SRA accounts and the income tax returns, 1946-1953, it would be mere speculation to find a joint adventure. Whatever the court may think of the manner in which the Kolodney brothers dealt with others, there is no doubt of their affection for their mother. The situation with respect to the real estate is more suggestive of a family arrangement whereby the sons managed the real estate primarily for their mother, who did not write or speak English, rather than a joint business venture between the three brothers for their joint profit. It is indeed probable that, being a mother, Dora Kolodney permitted her three sons to take and use so much of the income from the properties as was not necessary for her support, but this does not make the arrangement a joint business venture. The situation in *Dolan* v. *Dolan,* 107 Conn. 342, upon which the plaintiff relies, was entirely different.

As to a resulting trust, when property is purchased in the name of one person but the purchase price is furnished by another, unless there is an un-

derstanding to the contrary, there arises a resulting trust in favor of the one who furnished the purchase price. *Samasko* v. *Davis,* 135 Conn. 377, 381, citing *Fox* v. *Shanley,* 94 Conn. 350, 355; *Dickinson* v. *Dickinson,* 131 Conn. 392, 395; *Ward* v. *Ward,* 59 Conn. 188, 195. This rule is not applicable upon the facts, or inferences from the facts, with respect to any one of the five lots in question. If any inference is to be drawn, it is not that Samuel paid for these lots; it is that Dora paid for them. As was said by Mr. Dunn, the real estate agent who sold the Kolodneys some of these lots, "It must have been Dora's [money] because the boys didn't have any money."

As to lot 5, purchased in the name of Samuel and subsequently conveyed to his mother after a building had been constructed upon it, the principle of resulting trust would not be applicable in his favor.

No more does the record disclose facts necessary to create a constructive trust. There is no hint of fraud, misrepresentation, imposition, circumvention, artifice or concealment, or abuse of confidential relations, as between the three Kolodney brothers and their mother. *Verzier* v. *Convard,* 75 Conn. 1, 4. Fraud, actual or constructive, is the foundation on which the law raises a constructive trust. *Monski* v. *Lukomske,* 118 Conn. 635, 640. As to land, such a trust will arise when, in addition to the breach of a parol agreement, there is some element of fraud or bad faith which makes it inequitable that the person committing the fraud or acting in bad faith should hold the legal title absolutely discharged of any trust. *Sallies* v. *Johnson,* 85 Conn. 77, 80; *Reynolds* v. *Reynolds,* 121 Conn. 153, 159. There is no allegation and no suggestion of proof that the brothers practiced any fraud upon one another, or that Ralph and Abraham promised to reconvey any of the parcels to Samuel.

It is the claim of the plaintiff in her brief that lot 5 was transferred to Dora with the understanding that it would be reconveyed at some subsequent time and that the relationship of mother and son is sufficient to impress upon the transaction a constructive trust. As appears from the above, in order to raise a constructive trust, not only must there be a promise to reconvey but it must be a fraudulent one. *Sallies* v. *Johnson,* supra; Restatement, Restitution § 182, and comment b. There was no proof of any promise, express or implied, fraudulent or otherwise, on the part of Dora to reconvey this lot to Samuel. The fact that Samuel transferred lot 5 to his mother without consideration, all alleged, or that any of the other lots were transferred to her without consideration, is irrelevant. The quitclaim deeds recited a valuable consideration and their effect, therefore, as a legal act could not be nullified by proof that no actual consideration passed. *Monski* v. *Lukomske,* 118 Conn. 635, 640, and cases cited.

The plaintiff cannot prevail upon the sixth count.

The plaintiff is a proper party to sue (see memorandum in case No. 113511).

Judgment may enter for the plaintiff against the defendants Ralph and Abraham Kolodney on the first, fourth and fifth counts in the total sum of $1608.05, and in favor of these defendants on the second, third and sixth counts. Judgment may enter in favor of the defendant Dora Kolodney on all counts.