In the Matter of Barbara J. BOSSON, Bankrupt.

The CONNECTICUT BANK AND TRUST COMPANY

v.

Marc M. SCHINDELMAN, Esq., Trustee.

No. H–76–326.

United States District Court, D. Connecticut.

June 8, 1977.

maintains that the bankruptcy judge erred in ruling that the bank's security interest was inadequately perfected. The bankruptcy court's ruling was based on the fact that notice of the liens· in question was issued on certificates of title to the automobiles, which were taken out in the wife's name, while it was the husband who actually signed the underlying security agreement.

Whereas the appellant's argument as to perfection may have merit under the "notice filing" theory, which has been adopted in this Circuit,[2] the parties below failed to treat a central issue, namely, whether or not a valid security interest ever attached to the automobiles, since the husband, who signed the loan papers, did not acquire any readily apparent "rights in the collateral," as required under Article IX of the Connecticut Uniform Commercial Code [3] (UCC). The Court finds that the husband, Michael J. Bosson, did not in fact acquire sufficient "rights in the collateral" for Article IX purposes, and that his attempted security interest was thus defective. For the latter reason, the judgment of the bankruptcy court is affirmed.

Richard E. Gruskin, Gruskin & Gruskin, New London, Conn., for appellant.

Marc M. Schindelman, pro se.

## RULING ON PETITION FOR REVIEW

### CLARIE, Chief Judge.

The appellant, The Connecticut Bank and Trust Company (CBT), has filed this petition for review of a bankruptcy court ruling which granted possession of two automobiles to Marc Schindelman, the trustee in bankruptcy for Michael and Barbara Bosson,[1] said automobiles having been purchased approximately seven months prior to the debtors' bankruptcy. *Connecticut Bank and Trust Co. v. Schindelman*, Bky. No. H–76–326 (July 9, 1976). The appellant

## FACTS

In August of 1975, Michael J. Bosson and Barbara J. Bosson visited T.N.M. Lathrop, Inc. (Lathrop), a New London, Connecticut automobile dealership. There they negotiated the purchase of two used cars—a 1972 Volvo wagon and a 1974 Oldsmobile sedan—using the husband Michael Bosson's 1974 Mercedes sedan as part consideration for trade-in purposes. To make up the difference between the trade-in allowance on the Mercedes and the purchase price of the Volvo and Oldsmobile,[4] Michael Bosson negotiated a loan from the appellant bank and signed a pair of "retail installment contracts" purporting to grant Lathrop a se-

1. The Bossons filed separate bankruptcy petitions in Hartford on April 5, 1976. The petitions were consolidated shortly thereafter.

2. *See* note 12 *infra* and accompanying text.

3. Conn. Gen. Stat. §§ 42a–1–101 *et seq.* In referring to general UCC sections, it is under-

stood that the Connecticut enactment parallels the uniform version unless otherwise specified.

4. The total secured indebtedness on both cars was originally $8921. By the time of the reclamation petitions in bankruptcy court (May 24, 1976), the total debt had been reduced to $5395.50.

curity interest in the automobiles.[5] Neither of these contracts was signed by the wife, Barbara Bosson.

In concluding the foregoing transaction, Lathrop prepared the standard "New Owner Application" forms, which listed Barbara Bosson as the owner of the Volvo and of the Oldsmobile.[6] On the basis of these forms, the two cars were registered in Barbara Bosson's name, and certificates of title were issued listing her as the "new owner." Under Connecticut's Certificate of Title Act (CTA), Conn. Gen. Stat. §§ 14–165 et seq., security interests in automobiles can be perfected only by listing the name and address of the secured creditor on the vehicle's certificate of title. Id. § 14–185. CBT was properly listed as first lienor on the application, and its status so appeared on the final certificate. According to a Lathrop salesman who testified before the bankruptcy court, the purpose of listing the wife's name as owner was to make a gift to the wife and to conveniently establish title to the vehicles in her because of the husband's frequent out-of-state travel as a sports team official.[7]

Approximately seven and one-half months after the completion of this transaction, Michael and Barbara Bosson filed voluntary petitions in bankruptcy. Thereupon the CBT filed a complaint to recover possession of the automobiles from the trustee,[8] but the latter opposed this reclamation on the grounds that (1) there was no security interest as to the wife, since she never signed the security agreements; and (2) the interest granted by the husband was not perfected, since title was issued in the wife's name rather than in the husband's. The bankruptcy court concurred in this reasoning, and ruled in favor of the trustee. The appellant seeks a review of this judgment.

The Court must address two issues on this appeal: (1) Did the filing undertaken here adequately perfect CBT's purported security interest in the two automobiles purchased by the Bossons?; and (2) Did Michael Bosson grant an effective security interest in the vehicles to the bank which was capable of being perfected?[9] The Court finds the notice filing to have been adequate, but concludes that Michael Bosson never did acquire "rights in the collateral" sufficient for Article IX purposes, and that the appellant bank, therefore, did not acquire a security interest in the automobiles, which it could perfect.

---

**5.** Under the terms of the contract, the dealership's interest was immediately assigned to CBT. However, the contracts being recourse paper, Lathrop has been obliged to reimburse the bank, so that Lathrop now bears the ultimate burden of the loss.

**6.** As a prerequisite to attaining registration of (or certificate of title to) an automobile in Connecticut, the owner is required to submit a New Owner Application conforming to the requirements of Conn. Gen. Stat. §§ 14–12 and 14–171. Both the dealer and the purchaser must sign the form (in this case Barbara Bosson signed the forms in question as purchaser), and the owner retains one copy which serves as temporary registration until the Motor Vehicles Department has finished processing the original. If a security interest is noted on the application, the certificate of title is mailed directly to the first lienor, who retains it subject to final payment of the purchase price. Id. §§ 14–175 and 14–188. Should the conditional owner wish to transfer his or her interest to another person, the lienor holding the certificate must surrender it long enough for the assignment to be processed by the Motor Vehicles Department, unless of course the transfer would constitute a violation of the security agreement. Id. § 14–179. The Motor Vehicles Department has promulgated no general regulations to interpret the state's registration and certificate of title statutes.

**7.** Hearing in Bankruptcy Court, June 23, 1976.

**8.** Again, although CBT is the named claimant, Lathrop is the real party in interest, since the Bossons' installment contract was recourse paper, and the dealership has thus been obliged to reimburse the bank.

**9.** The bankruptcy court did not consider the question of whether or not there was an effective security interest. Several times the court did refer to perfection of the security *agreement* signed by Michael Bosson; a security agreement as such cannot be perfected, however, but only a security interest. Thus the question was not fully resolved below. The bankruptcy hearing did not focus on the security interest problem, but on the issue of perfection.

## DISCUSSION OF THE LAW

The bankruptcy court held that the appellant acquired no security interest in the vehicles in question through Barbara Bosson, although title was filed directly in her name duly listing CBT as first lienor in the vehicles, for the simple reason that the wife never signed the security agreement which such filing could perfect. Neither party contests this conclusion. What the appellant does attack is the second determination of the bankruptcy judge; namely, that perfection was inadequate as to Michael Bosson's security agreement, because the title certificate was issued in the wife's name rather than his own.

■ The Connecticut Certificate of Title Act does not rule out the feasibility of adequate perfection achieved through a filing of the type undertaken here. Section 14–185 of the Connecticut General Statutes, which governs the perfection of security interests in automobiles,[10] reads in relevant part as follows:

"[A] security interest in a vehicle . . is perfected by the delivery to the commissioner of the existing certificate of title, if any, an application for a certificate of title containing the name and address of the lienholder and the date of his security agreement and the required fee."

This statute does not require, either expressly or by fair implication, that the party signing the security agreement must also be the applicant for title.[11]

■ More substantial support for the permissibility of the transaction undertaken in the present case is to be found, however, in the theory of "notice filing." Under this theory, a court should, in reviewing an allegedly irregular attempt at UCC filing, look closely at whether or not "a reasonably diligent searcher" would be misled by the irregularity. J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 839 (1972). In applying the Connecticut UCC,[12] the Second Circuit has expressly adopted this approach. *In re Excel Stores, Inc.*, 341 F.2d 961 (2d Cir. 1965); *see also In re Hollis*, 301 F.Supp. 1 (D. Conn. 1969); Heffernan, *The Secured Creditor Versus the Trustee in Bankruptcy*, 45 Conn.B.J. No. 1, at 84 (Mar. 1971). In the present case, if Michael Bosson had attempted to apply for credit using either of the automobiles in question as collateral, a reasonably diligent creditor would not have been misled, since an inquiry with the Motor Vehicles Department would reveal that Michael Bosson did not own the car. Similarly, if Barbara Bosson attempted to borrow against either automobile, her prospective creditor would be put on notice of the existence of an encumbrance, and a simple inquiry to CBT would reveal the true nature of the transaction.[13] This being so, the filing in the present case cannot be

---

**10.** Article IX of the UCC expressly contemplates such special statutory filing arrangements. *See* Conn. Gen. Stat. § 42a–9–103(4).

**11.** Section 14–171(a) of the Connecticut General Statutes does require the New Ownership Application to include "the date of purchase *by the applicant* (emphasis supplied)." The requirement was met in the present circumstances, only if it can be assumed that Barbara Bosson was the purchaser of the vehicle. As discussed more fully below, under the Code and under the pre-Code contract doctrine Barbara Bosson would indeed be considered the "purchaser," or "buyer," of the automobile. Hence, it may be argued that there is nothing at all irregular in the instant transaction, insofar as compliance with the perfection statute is concerned.

**12.** *See* Conn. Gen. Stat. §§ 42a–9–401 (incorrect place of filing), 42a–9–402(5) ("minor errors" in filing). It is possible that under the wording of the Code a major documentary error may preclude adequate perfection even though it causes no one to be misled. White & Summers, *supra*, at 835 (doubting wisdom of such an interpretation). Here, however, it is not clear that there is an error at all, much less a major one. *See* note 11 *supra*.

**13.** A prospective creditor might not be able to force an existing lienholder to divulge information under Conn. Gen. Stat. § 14–189 ("Lienholder to furnish information concerning the security agreement"), since under that statute the obligation to disclose runs only to (1) the owner, and (2) to "another lienholder named on the certificate." Nevertheless, a prospective creditor with sufficient leverage could readily induce the owner to request disclosure.

viewed as defective under notice filing theory.

Were this the only issue in this case, the appellant might well prevail against the trustee. A key threshold question remains to be addressed, however, which the parties neglected to litigate below. Specifically, did the appellant ever acquire a valid security interest in the automobiles in question? Under the applicable provision of the Connecticut UCC, Conn. Gen. Stat. § 42a–9–203(1),[14] a security interest cannot attach unless three conditions are met: (1) the debtor must have signed a valid security agreement; (2) the creditor must have given value; and (3) the debtor must have "rights in the collateral." The first two of these conditions were clearly satisfied in the transaction between Michael Bosson and Lathrop, the automobile dealership. The problem arises over the third condition.

■ The UCC does not define the term "rights," except to specify that it includes "remedies." Conn. Gen. Stat. § 42a–1–201(36). The case law establishes the proposition that once a debtor acquires possession of an item of collateral pursuant to a sales contract or like agreement, the debtor has acquired sufficient "rights" for Article IX purposes.[15] See, e.g., Evans Products Co. v. Jorgensen, 245 Or. 362, 421 P.2d 978 (1966); First National Bank of Elkhart

County v. Smoker, 153 Ind.App. 71, 286 N.E.2d 203, 208–09 (1972); McCorquodale v. Holiday, Inc., 90 Nev. 67, 518 P.2d 1097 (1974) (no delivery); Cain v. Country Club Delicatessen of Saybrook, Inc., 25 Conn.Sup. 327, 203 A.2d 441 (Supr. Ct. 1964) (no contract); 30 A.L.R.3d 9, 44 [§ 13] (1970). Were this test to be applied as controlling in the present case, the appellant's claim would fail, since it was Barbara Bosson rather than her husband Michael who received possession of the automobiles, pursuant to her acknowledged status as the intended owner of the vehicles. However, the "possession-pursuant-to-a-contract" test is not a satisfactory guide to a proper result here.

Apart from the rather cursory treatment given to policy questions in many of the cases noted above, none involved a fact situation of the type presented here. In particular, none of the above-cited cases involved an automobile, which must be registered under a Certificate of Title Act. To adequately address the question of a debtor's rights in the particular context of this action, the Court must return to the specific statutory language of the Connecticut CTA and UCC, and to the policy considerations which underlie these statutes. Neither statute expressly contemplates the type of transaction here undertaken,[16] but suffi-

14. The requirements for attachment and enforceability of a security interest were formerly included in Sections 9–203 and 9–204. The 1976 amendment which consolidated these provisions has no substantive effect on the instant controversy.

15. In Lonoke Production Credit Ass'n v. Bohannon, 238 Ark. 206, 379 S.W.2d 17 (1964), the court stated as its test, that there must be "some ownership in the collateral which [the debtor] can encumber." This test was based directly upon language inserted into the uniform statute by the Arkansas legislature as it enacted the Code, however, and the rule in Lonoke is thus not of universal applicability. On the other hand, if a particular legislature's sense of the Article IX "rights in the collateral" requirement is sound, it may quite properly be considered by this Court. Here especially, the element of encumberability seems clearly important in construing the statutory condition.

A case which takes a different tack is In re Pelletier, 5 UCC Rep. 327, 337 (D.Me.Ref. Dec.

May 3, 1968). There, the referee in bankruptcy decided that the array of miscellaneous rights provided to a buyer under Article II is sufficient to support a security interest. While the Court is not in full agreement with the broad brush approach taken by the referee in Pelletier, as discussed below, the question is rendered moot in this case, because Michael Bosson is not the "buyer" of the automobiles for Article II purposes.

16. To the extent that either statute recognizes the type of transaction involved here, it makes Barbara Bosson the purchaser. The UCC does not expressly discuss third party beneficiary agreements, but there are sufficient grounds for designating Barbara Bosson as the Article II "buyer" on the basis of statutory construction. Likewise, the Connecticut CTA assumes that the applicant for title will also be the "purchaser." See note 11 supra. To the degree that the statute applies to the present case, Barbara Bosson is therefore the "purchaser."

cient leads or indications may be ascertained to guide the Court's inquiry.

In some states, notably Ohio and Colorado, the issue in this case could be resolved solely on the basis of the state's CTA. In both states, the legislature has expressly provided that its motor vehicle title statute is meant to be exclusive. Under the statutes in question, no interest may be asserted in an automobile, either legal or equitable, except through documents of title, absent direct evidence of fraud. *See In re Estate of Case,* 161 Ohio St. 288, 118 N.E.2d 836 (1954); *Levin v. Nielsen,* 37 Ohio App.2d 29, 306 N.E.2d 173 (1973); *Guy Martin Buick, Inc. v. Colorado Springs Bank,* 184 Colo. 166, 519 P.2d 354 (1974); Note, *The Effect of a Motor Vehicle Registration Statute on Resulting Trusts in Automobiles,* 64 Yale L.J. 458 (1955). In a state adopting this principle, Michael Bosson's failure to ever acquire certificates of title to the automobiles in question would preclude the bank's claim under Article IX.

Connecticut's CTA contains no such limiting provision, however. Indeed, the approach of the Uniform Act (adopted in Connecticut in 1959) is to specify that the title is "prima facie," but not irrebuttable, evidence of true ownership. Conn. Gen. Stat. § 14–174(d).[17] While the level of rebuttal necessary to overcome the statutory presumption is not clearly defined,[18] the Connecticut CTA provides some room for the operation of supplementary principles of law and equity and such principles must therefore be examined.

■ Ordinarily, where Vendee A purchases an item from Vendor B, and directs that title be vested directly in C, a resulting trust may be imposed by the court based upon the presumption that A did not intend to part with value without some consideration from C. Hence, C is viewed as A's "trustee." Restatement Second, *Trusts* §§ 440–60 (1959); *Dickinson v. Dickinson,* 131 Conn. 392, 40 A.2d 184 (1944); *Fox v. Shanley,* 94 Conn. 350, 190 A. 249 (1920); *Cowles v. Whitman,* 10 Conn. 121, 125, 25 Am.Dec. 60 (1834); *Kolodney v. Kolodney,* 21 Conn.Sup. 318, 154 A.2d 533 (Supr. Ct. 1959). The resulting trust presumption is reversed in a case where A and C are husband and wife, however; and under such circumstances, absent evidence of an intent to defraud creditors, it is presumed that a gift was intended. *See Franke v. Franke,* 140 Conn. 133, 138–39, 98 A.2d 804 (1953); *White v. Amenta,* 110 Conn. 314, 148 A. 345 (1929); *Wilson v. Warner,* 89 Conn. 243, 93 A. 533 (1915); *Ward v. Ward,* 59 Conn. 188, 22 A. 149 (1890). In the present case, the resulting trust presumption would be offset by virtue of the fact that Michael and Barbara Bosson were married and thus it would be assumed that Michael Bosson intended a gift. Furthermore, there is evidence in this case to suggest that Michael Bosson did *in fact* intend a gift to his wife, and also that the couple's intentions were nonfraudulent.[19] Therefore, under the resulting trust doctrine, CBT's claim of possession to the automobiles in question (based on the bank's status as Michael Bosson's creditor) would fail.

A leading case on point illustrates the application of the resulting trust doctrine in this area. In *Majors v. Majors,* 349 Pa. 334, 37 A.2d 528 (1944), a wife contracted for the purchase of an automobile, title to which

**17.** The provision reads as follows: "A certificate of title issued by the commissioner is prima facie evidence of the facts appearing on it." In cases decided before the passage of the CTA, the Connecticut Supreme Court recognized that the legal and equitable title holders might be different persons. *Marciel v. Berman,* 104 Conn. 165, 132 A. 397 (1926); *Kaufman v. Hegeman Transfer & Lighterage Terminal, Inc.,* 100 Conn. 114, 123 A. 16 (1923); *Brown v. New Haven Taxicab Co.,* 92 Conn. 252, 102 A. 573 (1917). No case definitely interpreting the CTA has been located.

**18.** In Note, Connecticut Certificate of Title and Anti-Theft Act, 33 Conn.B.J. 223, 226–27 (June 1959), the author suggests that the legislature may have intended a rather forceful presumption.

**19.** *See* note 7 *supra* and accompanying text.

was placed in her husband's name.[20] Later, a judgment creditor of the husband attempted to levy on the automobile, but the husband argued that the car actually belonged to the wife, who had paid the purchase price and was the principal user. The court held that in light of the wife's having vested her husband with title, and with full appearances thereof, a great burden of proof rested upon her to establish a resulting trust. This burden not having been met, the car was awarded to the creditor. Whereas the present case involves a creditor of the party tendering payment, rather than of the party receiving indicia of title, the operation of the law with respect to resulting trust doctrine is entirely analogous.[21]

Elimination of the resulting trust doctrine from consideration does not fully resolve the question before the Court, however, since there are additional theories upon which it may be argued, at least, that Michael Bosson acquired "rights in the collateral." One approach is to examine rights which the husband may have acquired in the collateral under Article II of the Uniform Commercial Code. Assuming for the moment that Michael Bosson was the "buyer" of the cars under the Code,[22] two questions arise under the Code's Article II provisions: (1) Did Bosson ever acquire title to the automobiles; and (2) did he acquire specific Article II rights sufficient to support an Article IX security interest?

While Article II strives diligently to minimize title concept under the law of sales, the drafters recognized that problems would arise which were not covered by Article II provisions, and that in such situations the question of title might be of continued importance. For this reason, § 2–401 was added to the Code.[23] Under § 2–401(2), it is provided that, in general,[24] title passes from the seller to the buyer "at the time and place at which the seller completes his performance with reference to the phys-

---

20. There were no certificate of title acts as such at this time. "Title" was thus used in the traditional, property law sense.

21. On similar facts, a lower New York court submitted the question of ownership to the jury. *Peninsula State Bank v. Beneficial Finance Co. of New York*, 15 UCC Rep. 503 (Sup. Ct. 1974).

22. As discussed below, a contrary conclusion emerges from statutory interpretation.

23. Section 2–401 reads, in its relevant part: "*Passing of title; reservation for security; limited application of this section.* Each provision of this article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply:

"(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract as provided by section 42a–2–501 and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of article 9, title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

"(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but (b) if the contract requires delivery at destination, title passes on tender there."

24. Although § 2–401(2) begins with the phrase "[u]nless otherwise explicitly agreed," the prior subsection places limits on the parties' contractual freedom. Specifically, § 2–401(1) negates any attempt to forestall passage of title beyond the moment of final delivery; contract language purporting to do so merely results in a security interest being retained. Similarly, § 2–401(1) prohibits the passage of title prior to the identification of the goods in question to the contract. In between these extremes, however, the parties may by contract specify the point at which title passes.

ical delivery of the goods, despite any reservation of a security interest. . . ."

■ Although the retail sales contract signed by Michael Bosson provided that title should remain in Lathrop until payments on the car were complete,[25] the effect of such language was merely to create a security interest. Conn. Gen. Stat. § 42a–2–401(1). Absent an effective agreement to the contrary, then, title passed out of Lathrop at the moment when the seller "completed its performance," that is, at the moment when the dealer's representative handed the car keys and the necessary accompanying documents to Barbara Bosson. Although the parties might have provided differently by contract, they neglected to do so, and in such cases the Code specifies the outcome as a matter of law. Here, the conclusion of law is that title passed directly to Barbara Bosson, without first passing through Michael Bosson.

The remaining arguments under Article II concern special prerogatives afforded the buyer in specified circumstances surrounding the sales transaction.[26] The existence of such prerogatives has no bearing on the present case, however, because the Code's definition sections point to Barbara Bosson, rather than to Michael, as the "buyer" entitled to exercise whatever rights may be involved. UCC § 2–103(1)(a) defines "buyer" as one "who buys or contracts to buy goods." While the term "buy" is not defined as such, "sale" is defined as "the passing of title from the seller to the buyer for a price, as provided in section 2–401." UCC § 2–106(1). It has already been established that under § 2–401 title passed directly from Lathrop to Barbara Bosson, without first coming to rest in Michael. Hence, it is difficult to refute the fact, that under the Code, Barbara Bosson was the "buyer" and entitled to exercise the buyer's Article II prerogatives.[27]

■ Even if the Code were worded so that Michael Bosson could be construed to be a "buyer," at least prior to the final delivery of the automobiles, the Court is of the opinion that most of the proposed Article II rights would be insufficient from the standpoint of establishing Article IX "rights in the collateral." With one exception not immediately relevant,[28] the proposed pre-delivery rights are either highly contingent, partial as to the collateral, or not uniquely available to the buyer. Such rights would provide a tenuous foundation upon which to erect a meaningful law for secured transactions.

**25.** Paragraph 5 of Retail Installment Contracts, Aug. 20, 1975.

**26.** *See, esp.,* UCC §§ 2–501 ("special property and insurable interest"), 2–502 (buyer's right to recover goods upon seller's insolvency, after payment in full), 2–711 (buyer's remedies in general), 2–716 (replevin and specific performance), 2–722 (action for damages to goods). The referee in *In re Pelletier,* 5 UCC Rep. 327 (D.Me.Ref. Dec. May 3, 1968), deemed these prerogatives to be sufficient; the facts in that case were not comparable to those present here.

**27.** This result is consistent with the contractual doctrine of third party beneficiaries, as discussed below. Also, it is not *in*consistent with the express intention of the parties, which is singularly ambiguous. While Michael Bosson is listed as the "purchaser" on the retail installment contracts, Barbara Bosson is designated as "purchaser" on the New Owner Application forms submitted to the MVD.

**28.** The exception is § 2–716, which confers upon the buyer a right of action for (1) replev-

in, and (2) specific performance. In a normal sales transaction, the replevin remedy could be particularly promising as a basis for ascribing "rights in the collateral" to an incipient buyer. Replevin is a purely statutory remedy in Connecticut. *See generally* Conn. Gen. Stat. §§ 52–515 *et seq.* It is not so restricted in its availability as specific performance (*see* discussion *infra*), and is maintainable once goods have become identified to the contract. UCC § 2–716(3).

The problem with replevin in the immediate circumstances is that it depends upon the plaintiff's having a direct right to possess the goods involved. Michael Bosson never negotiated for possession in himself, and thus would not be a proper party to bring the action. A state court might conceivably permit a purchaser in Michael Bosson's position to sue in replevin as trustee for the ultimate beneficiary (*i.e.,* for Barbara Bosson). Absent direct authority for such an action, however, the Court will not presume to expand the state law along such lines.

▇▇▇▇▇ Having ruled out Article II as a basis for ascribing "rights in the collateral" to Michael Bosson, there remains one final possibility, which arises out of pre-Code contract law.[29] Specifically, it might be argued that Michael Bosson's status as the promisee in a third party beneficiary contract,[30] in which Lathrop was the promisor and Barbara Bosson was the beneficiary, would be sufficient to support an action on the contract for specific performance, and that his capacity to bring such an action conferred sufficient "rights in the collateral" to support a security interest. While the promisee in a third party gift contract may only sue for nominal damages, since it is typically the beneficiary rather than the promisee who suffers tangible loss from nonperformance,[31] it is generally agreed that the promisee *may* sue both for rescission/restitution and for specific performance, in an appropriate case.[32] The drawback to this approach under the present circumstances is that a contract for the sale of personalty is not usually enforceable through specific performance, a remedy in damages being deemed to be adequate.[33] Courts have expressly adopted this view in cases involving contracts for the sale of automobiles, including used automobiles.[34] The proposed right which may have existed in Michael Bosson is of such dubious enforceability, it can scarcely be called a "right" at all, and this ground of argument must fail.[35]

The Court fully recognizes that a result favoring the trustee in this action—while required by a fair analysis of the statutory scheme and of the relevant supplemental case law authorities—does operate harshly with respect to the appellant. The bank's loan to Michael Bosson was made in entirely good faith, and the parties plainly intended that the automobiles in question should serve as collateral for the loan. Although the drafters of the UCC sought to avoid the

**29.** The UCC provides that "[u]nless displaced by the particular provisions of this title, the principles of law and equity . . . shall supplement its provisions." Conn. Gen. Stat. § 42a–1–103. Thus, where the Code does not directly control a particular question, pre-Code authority may be consulted to resolve the matter.

**30.** *See generally* 2 S. Williston on *Contracts* Ch. 14 §§ 347–403 (3d ed. 1959) ('Williston'); Restatement, *Contracts* Ch. 6 §§ 133–47 (1932); Corbin, "Contracts for the Benefit of Third Persons in Connecticut," 31 Yale L.J. 489 (1922).

**31.** 2 Williston, *supra*, §§ 359, 390; L. Simpson, *Contracts* § 116 (1954), at 242–43; Restatement 2d, *Contracts* § 136, Comment a (T.D. No. 3 at 35, Apr. 18, 1967). This limitation applies only to gift contract promisees, not to promisees under a creditor beneficiary contract.

**32.** 2 Williston, *supra*, § 359; Simpson, *supra*, § 116; Note, "Contracts for the Benefit of Third Persons—Gift Promises—Right of Promisee to Substantial Damages," 39 Yale L.J. 1061 (1931). The rule on specific performance is stated as follows:

"Where specific performance is otherwise an appropriate remedy, either the promisee or the beneficiary may maintain a suit for specific enforcement of a duty owed to an intended beneficiary."
Restatement 2d, *Contracts* § 138 (T.D. No. 3, at 42, Apr. 18, 1976). *See also id.* Comment d.

**33.** *See generally* 11 Williston, *supra*, § 1419. The comments to UCC § 2–716 propose a liberalized approach to specific performance, at least where a buyer is unable to "cover" in the marketplace. It seems doubtful that the appellant would be entitled to a decree for specific performance under the facts in this case, however, even if the drafter's suggestion were adopted.

**34.** *See Gallagher v. Studebaker Corp.,* 236 Mich. 195, 210 N.W. 233, 154 A.L.R. 4, 60 (1926) (used car); *Poltorak v. Jackson Chevrolet Co.,* 322 Mass. 699, 79 N.E.2d 285 (1948) (new car, manufacturing shortage); *Welch v. Chippewa Sales Co.,* 252 Wis. 166, 31 N.W.2d 170 (1948) (same); *but see DeMoss v. Conart Motor Sales,* 72 N.E.2d 158 (Ohio Com.Pl.1947), *aff'd on other grounds,* 149 Ohio St. 299, 78 N.E.2d 675 (1948) (manufacturing shortage, extensive delay).

**35.** It might be otherwise if (1) there was evidence to suggest some unique or otherwise special value to the car, of the type traditionally countenanced by courts of equity, or (2) if there was clear and extremely reliable evidence to suggest that the promisee's donative intent arose after the identification of the goods to the contract. In the latter case, it could not be said that anyone other than the promisee was the "buyer" at the time of identification, and so between that time and the time at which a donative intent was formed a right to replevin would presumably be available under the Code.

Uniform Sales Act's heavy emphasis upon the intentions of the parties in construing contracts,[36] they also meant for the Code to be interpreted so as to "permit the continued expansion of commercial practices through custom, usage and agreement of the parties . . . ."[37]

The present transaction does not call for a remedial interpretation on the part of the Court, however. To begin with, the transaction was not carried out in accordance with the sound custom of the trade. It is typical, in a secured sales transaction involving a third-party gift beneficiary, for the donee to sign the security agreement as co-maker. The printed forms which were signed by Michael Bosson in this case allowed space expressly for a co-maker's signature. Had the normal practice been followed, none of the present difficulties would have arisen. Likewise, the contract might have been worded so that title would have passed to the signor at the earliest possible moment—either upon the signing itself, or upon the identification of the goods to the contract, whichever came later.[38]

The loss of security in this case was ultimately the lender's own doing, therefore, since simple alternatives were readily available in structuring the transaction which could have obviated the present problem, and which would have been more in keeping with standard commercial practice in the area. It is too late now to reform the agreement in question, however, and so the seller must bear the immediate burden. The resolution of commercial disputes frequently necessitates hard decisions between closely competing interests (here, the interests of the trustee versus those of the secured creditor). Such decisions must at times conform to long-range needs of statutory rulemaking, the precise equities of an immediate situation notwithstanding. This is especially so where an act or omission of one party, while not of great apparent im-

port, is ultimately responsible for the controversy which has evolved.

 Because the debtor, Michael Bosson, never received "rights in the collateral," as required for the attachment of an Article IX security interest, the trustee in bankruptcy was properly awarded possession to the automobiles in question. The ruling of the bankruptcy court to this effect is thereby affirmed.

SO ORDERED.

---

**36.** This was particularly true with questions of title, which assumed broad significance under the Sales Act. *See* 67 Am.Jr.2d *Sales* §§ 228–30 (1973).

**37.** Conn. Gen. Stat. § 42a–1–102(2)(b).

**38.** *See* note 24 *supra* and accompanying text.